

1  William A. Hanssen (Bar No. 110613)
   Suzanne V. Stouder (Bar No. 161077)
2  DRINKER BIDDLE & REATH LLP
   1800 Century Park East, Ste. 1400
3  Los Angeles, CA  90067
   Telephone:  (310) 203-4000
4  Facsimile:  (310) 229-1285
   william.hanssen@dbr.com
5  suzanne.stouder@dbr.com

6  Michael J. Miller (admitted *Pro Hac Vice*)
   Jason P. Gosselin (admitted *Pro Hac Vice*)
7  Jonathan D. Pavlovcak (admitted *Pro Hac Vice*)
   DRINKER BIDDLE & REATH LLP
8  One Logan Square, Suite 2000
   Philadelphia, PA  19103-6996
9  Telephone:  (215) 988-2700
   Facsimile:  (215) 988-2757
10 michael.miller@dbr.com
   jonathan.pavlovcak@dbr.com
11
   Attorneys for Plaintiff
12 HARTFORD LIFE AND ANNUITY
   INSURANCE COMPANY
13
14            UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA
16                    WESTERN DIVISION

17 HARTFORD LIFE AND ANNUITY        ) Case No. 2:10-cv-07560-PSG-DTB
   INSURANCE COMPANY,               )
18                                  )
          Plaintiff,                )
19                                  )
      vs.                           ) **PLAINTIFF HARTFORD LIFE**
20                                  ) **AND ANNUITY INSURANCE**
   DORIS BARNES FAMILY 2008         ) **COMPANY'S MEMORANDUM OF**
21 IRREVOCABLE TRUST, GARY          ) **POINTS AND AUTHORITIES IN**
   BARNES, as Trustee of the Doris  ) **SUPPORT OF ITS MOTION FOR**
   Barnes Family 2008 Irrevocable Trust, ) **PARTIAL SUMMARY JUDGMENT**
22 JOHANN JOHN JEAN,                )
   RENAISSANCE LIFE INSURANCE       ) Date:  January 30, 2012
23 INVESTMENT TRUST II, and         ) Time:  10:00 A.M.
   NOVEL                            ) Judge:  Philip S. Gutierrez
24 CAPITAL VENTURES, LLC,           ) Magistrate Judge:  David T. Bristow
                                    )
25          Defendants.             ) **Complaint filed: October 8, 2010**
                                    )
26                                  )
                                    )
27
28

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................. 1

II. STATEMENT OF FACTS ................................................................................. 2

    A.    Application for the Barnes Policy ................................................... 2

    B.    True Circumstances Surrounding Procurement of the Barnes
            Policy .............................................................................................. 6

          1.    Mrs. Barnes Is Recruited to Participate in a STOLI
                 Scheme ................................................................................ 6

          2.    The Application for the Barnes Policy ................................. 7

          3.    The Use of a Sham Trust ................................................... 10

          4.    Beneficial Interest Transfer ............................................... 11

III. ARGUMENT .................................................................................................. 14

    A.    Hartford is Entitled to Summary Judgment Because the Barnes
            Policy Is an Illegal Wagering Contract. ...................................... 14

          1.    Historical Prohibition on Using Life Insurance to
                 Gamble on Lives of Strangers. .......................................... 15

          2.    California's Prohibition on Wagering Policies and the
                 Requirement of an Insurable Interest. ............................... 16

          3.    Barnes Policy is an Illegal Wagering Contract ................. 17

    B.    Use of a Trust To Engage in Illegal Wagering Does Not Make
            Illegal Contract Legitimate. ........................................................ 20

          1.    Insurance Code Prohibits Any Artifice Designed to Give
                 the Appearance of Insurable Interest. ............................... 21

          2.    Courts Are Obliged to Look Beyond Formalities and
                 Assess the Substance of a Transaction. ............................. 22

    C.    Hartford is Entitled to Retain All Premium Paid In Connection
            With the Barnes Policy. ............................................................... 23

IV. CONCLUSION ............................................................................................... 25

i

# TABLE OF AUTHORITIES

## CASES

*Aetna Life Ins. Co. v. Paul,*
   10 Ill. App. 431 (Ill. App. Ct. 1882) ........................................................ 25

*Allen v. Commissioner,*
   925 F.2d 348 (9th Cir. 1991) .................................................................. 23

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................... 15

*Bosse v. Knights & Ladies of Sec.,*
   220 S.W. 993 (Mo. Ct. App. 1920) ......................................................... 25

*Buchwald v. Superior Court,*
   254 Cal. App. 2d 347, 62 Cal. Rptr. 364 (1967) .................................... 23

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................... 15

*Columbian Nat'l Life Ins. Co. v. Mulkey,*
   91 S.E. 106 (Ga. 1916) .......................................................................... 25

*E. & J. Gallo Winery v. EnCana Energy Servs., Inc.,*
   No. CVF 03-5412,
   2004 U.S.Dist. LEXIS 29383, fn. 5 (E.D. Cal. May 14, 2004) .............. 23

*FTC v. Stefanchik,*
   559 F.3d 924 (9th Cir. 2009) .................................................................. 15

*Fisher v. Metro. Life Ins. Co.,*
   35 N.E. 849 (Mass. 1894) ...................................................................... 25

*Galen v. Cnty. of Los Angeles,*
   477 F.3d 652 (9th Cir. 2007) .................................................................. 15

*Grigsby v. Russell,*
   222 U.S. 149 (1911) ............................................................................... 17

*Hartford Life & Annuity Ins. Co. v. Barnes Trust,*
   No. CV-10-7560 (C.D. Cal. Feb. 22, 2011) ........................................... 22

*Hellman v. Nat'l Council of the Knights and Ladies of Sec.,*
   200 S.W. 698 (Mo. Ct. App. 1918) ......................................................... 25

*Himely v. South Carolina Ins. Co.,*
   1 Mill Const. 154, 1817 WL 669 (S.C. Const. 1817) .............................. 25

*Jimenez v. Protective Life Ins. Co.,*
   8 Cal. App. 4th 528, 10 Cal. Rptr. 2d 326 (1992) .................................. 18

*Lencioni v. Fid. Trust & Sav. Bank,*
  95 Cal.App. 490, 274 P. 75 (1929) ......................................... 23

*In re Marriage of Dick,*
  15 Cal. App. 4th 144, 18 Cal. Rptr. 2d 743 (1993) ................................ 24

*Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ........................................................... 15

*McColgan v. Walter Magee, Inc.,*
  172 Cal. 182, 155 P. 995 (1916) ..........................................23-24

*Modern Woodmen of Am. v. Int'l Trust Co., Guardian,*
  136 P. 806 (Colo. App. Ct. 1913) ............................................ 25

*Nat'l Mut. Fire Ins. Co. v. Duncan,*
  98 P. 634 (Colo. 1908) ...................................................... 25

*Odnil Music Ltd. v. Katharsis LLC,*
  No. 5-05-0545,
  2007 U.S. Dist. LEXIS 82326 (E.D. Cal. Nov. 6, 2007) ....................... 23

*Ohio Nat'l Life Assurance Corp. v. Davis,*
  No. CV-10-4241 ODW,
  2010 WL 4916643 (C.D. Cal. Dec. 1, 2010) ................................. 22

*Osbourne v. Sec. Ins. Co.,*
  155 Cal. App. 2d 201, 318 P.2d 94 (1957) ................................... 18

*PHL Variable Ins. Co. v. Clifton Wright Family Ins. Trust,*
  No. 09-2344,
  2010 U.S. Dist. LEXIS 35643 (S.D. Cal. Apr. 12, 2010) ...................... 25

*PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust,*
  Civil No. 08-572,
  2010 U.S. Dist. LEXIS 29501 (D. Minn. Mar. 3, 2010) ....................... 25

*Ray v. United States,*
  121 F.2d 416 (7th Cir. 1941) ................................................ 25

*In re Walkerly's Estate,*
  108 Cal. 627, 41 P. 772 (1895) .............................................. 24

*Warnock v. Davis,*
  104 U.S. 775 (1882) ..................................................... 16, 18

*West Pico Furniture Co. v. Pac. Fin. Loans,*
  2 Cal. 3d 594, 469 P.2d 665 (1970) ......................................... 23

*Wuliger v. Mfrs. Life Ins. Co.,*
  567 F.3d 787 (6th Cir. 2009) ................................................ 25

**STATUTES**

2009 Cal. Stat., Ch.. 343 ................................................. 17, 22

iii

Cal. Civ. Code, § 3528 ...................................................................... 23

Cal. Ins. Code § 250 ............................................................... 1, 17, 21

Cal. Ins. Code § 252 ..................................................................... 1, 17

Cal. Ins. Code § 483 ......................................................................... 24

Cal. Ins. Code, § 10110.1 ................................................. 17, 18, 22, 24

Cal. Prob. Code, § 15203 ................................................................. 24

Fed. R. Civ. P. 56 ............................................................................. 15

## OTHER AUTHORITIES

Life Assurance Act, 1774, 14 Geo. 3, c. 48, § 1 (Eng.) ............................... 16

76 Am. Jur. 2d Trusts § 20 ................................................................ 24

5 Couch on Insurance 3d, § 79:40 ....................................................... 25

## I.

## **INTRODUCTION**

There is a difference between a wager and insurance.  With a wager, a person creates a risk in the hope of receiving a payoff.  For example, when a person places a bet on the outcome of a sporting event, he puts money at risk on the chance that he will receive some other reward.  The risk – the possibility of losing his bet – did not exist before he created it.  In contrast, insurance protects against an existing risk.  A person who owns a home, for example, always has the risk that his property might be destroyed by fire, flood, or some other catastrophe.  When a homeowner buys insurance, he is not placing his premium money in jeopardy in the hope of receiving a larger payoff, but instead is purchasing protection against a risk he already bears.

California's Insurance Code recognizes the distinction between a wager and insurance.  Indeed, wagering contracts are flatly prohibited, *see* Cal. Ins. Code § 252 ("[a] policy executed by way of gaming or wagering, is void"), and insurance can *only* be purchased to protect against events that will cause actual harm to the purchaser.  *See* Cal. Ins. Code § 250 ("any contingent or unknown event, whether past or future, which may damnify a person . . . may be insured against").  In order to facilitate the permissible use of insurance as well as the prohibition on wagering, California's Insurance Code requires the existence of an insurable interest at the inception of any policy of insurance.  In the context of life insurance in particular, the person procuring the insurance must have an interest, based on a family relationship or the expectation of pecuniary gain, in the *continued* life of the insured.  In the absence of an insurable interest, the life insurance policy is nothing more than a manufactured risk intended as a wager.

In this case, Hartford Life and Annuity Insurance Company seeks a declaration that an $8.75 million policy of insurance issued on the life of Doris Barnes is void *ab initio*.  Unbeknownst to Hartford at the time of issuance, the

1

1 Barnes policy was an illegal wagering contract orchestrated by and for the benefit of

2 stranger investors.[1]  Mrs. Barnes, a woman of modest means, had no need for the

3 policy and no ability to pay for it.  In 2007, she was approached by an individual

4 who promised her a cash payment if she would participate in a scheme to procure

5 insurance on her life.  She was told that the policy would be transferred to investors,

6 and that she would incur no out-of-pocket costs.  Mrs. Barnes agreed to go along

7 with the scheme, and an application was later submitted to Hartford.  In addition to

8 misrepresenting the true purpose of the policy, the application grossly

9 misrepresented Mrs. Barnes' annual income and net worth as well as the source of

10 the premium payments.  The policy did not serve to protect against any insurable

11 loss.  In fact, the process of transferring the policy to an investor – in a transaction

12 entirely hidden from Hartford – began before the policy even went into effect.

13     For the reasons set forth below, this Court should enter summary judgment in

14 favor of Hartford with respect to Count I of Hartford's complaint.  Specifically, the

15 Court should declare the policy void *ab initio* because it is an illegal wagering

16 contract that lacked in insurable interest at inception.  The Court should also declare

17 that Hartford may retain all premium paid upon the policy.

18                                         **II.**

19                          **STATEMENT OF FACTS**

20 **A.     Application for the Barnes Policy**

21     On February 27, 2008, Hartford received an application for life insurance on

22 the life of Mrs. Barnes, who was then a 73-year-old resident of California.  The

23 insurance producer was a California-based agent named Johann John Jean, who was

24 affiliated with an agency called Diverse Financial Insurance Services.[2]  Transcript of

25 _____

26 [1] Such policies are often referred to as Stranger Originated Life Insurance, or STOLI.

27 [2] Diverse Financial Insurance Services and Diverse Financial Funding are related entities with
common owners.  They are referred to collectively as "Diverse Financial."

28

1 Deposition of Johann John Jean, Ex. A at 36:23-37:8.[3]  Insurance agents typically do
2 not submit an application to an insurer directly.  *See* Transcript of Deposition of
3 Clark Crawford, Ex. O, at 58:15-60:17.  Instead, applications are typically submitted
4 through a general agent, who assists in gathering records and other materials
5 necessary for underwriting. *Id.*, at 13:3-11, 58:15-60:17.  In this case, Diverse
6 Financial submitted the application for the Barnes policy through Volios Group
7 LLC, a New Jersey-based general agent.  *See Id.,* at 54:2-60:17.

8      The life insurance application indicated that the owner and beneficiary of the
9 policy would be the Doris Barnes Family 2008 Irrevocable Trust, and that Gary
10 Barnes, the insured's adult son, would be the trustee of the Barnes trust.
11 Application, Ex. B, at B-13, 14, and 19.  The application was signed by Mrs.
12 Barnes, the insured, Gary Barnes, trustee of the trust, and Jean, the agent. *Id.* at
13 B-19.

14      Because Hartford does not issue life insurance policies that are intended for
15 investors in the secondary market, the application included a series of questions to
16 determine whether the sought-after policy was a cover for an illegal wager. *See*
17 Hartford's Anti-STOLI Memoranda, Ex. P; Application, Ex. B, at B-17.  In
18 particular, Questions 11(l), (m), and (n) of the application sought information
19 regarding the purpose of the policy, the source of the premium, and whether the
20 insured had been offered any inducement in exchange for applying for insurance:

> Is the proposed Policy owner or Insured(s) considering assigning
> or transferring rights or interests in this policy now or in the
> future, including ownership or beneficiary interests, to an
> unrelated third party such as (but not limited to) a life settlement
> company, viatical, bank and/or lending or investment company?
> (If "Yes," provide details.)        □ Yes... □ No

---

[3] All exhibits cited are attached to the contemporaneously filed Declaration of Jonathan D. Pavlovcak.

Is all or any part of the initial or future premium payments for this life insurance policy directly or indirectly being financed by an unrelated third party (individual or entity), or part of any loan arrangement?  **(If "Yes," provide details below including the name of the program, vendor and/or lender being used.)** (Emphasis in original.)   □ Yes... □ No

Has the proposed Policy owner or Insured(s) been offered any financial incentives as inducements to apply for this policy such as (but not limited to) premium loans or other payments?  (If "Yes," provide details below.) □ Yes... □ No

Application, Ex. B, at B-17.  The "No" box was checked for each of these questions on the application.  *Id.*

In addition, Mr. Jean signed a Producer Information form in support of the application.  Producer Information, Ex. C.  The Producer Information form contained a series of questions similar to Question Nos. 11 (l), (m) and (n) on the application.[4]  *Id.*, at C-20.  In response to these questions, which were also designed to discern whether a policy was being sought for the benefit of investors, Jean denied any knowledge of an intent to transfer the policy to a third-party, denied that a third-party would fund the premium payments, and denied that Mrs. Barnes had

---

[4] Do you have any knowledge or reason to believe that the Proposed Insured(s) are considering assigning or transferring rights or interests in this policy now or in the future, including ownership or beneficiary interests, to an unrelated third party such as (but not limited to) a life settlement company, viatical, bank and/or lending or investment company?  (If "Yes," provide details.) □ Yes... □ No

Do you have any knowledge or reason to believe that all or any part of the initial or future premium payments for this life insurance policy directly or indirectly being financed by an unrelated third party (individual or entity), or part of any loan arrangement?  **(If "Yes," provide details below including the name of the program, vendor and/or lender being used.)** (Emphasis in original.) □ Yes... □ No

Do you have any knowledge or reason to believe that  the proposed Policy owner or Insured(s) been offered any financial incentives as inducements to apply for this policy such as (but not limited to) premium loans or other payments?  (If "Yes," provide details below.)  □ Yes... □ No

1   been offered any inducements to apply for the policy. *Id.*

2        As part of the application process, Hartford also required the completion of a

3   financial statement. *See* Financial Statement, Ex. D.  According to the Financial

4   Statement, which appeared to have been prepared and signed by Ronald Mitchell, a

5   Certified Public Accountant familiar with Mrs. Barnes' finances, Mrs. Barnes'

6   annual income was $658,000 and her gross net worth was $16,261,000. *Id.*

7   Moreover, Clark Crawford, a principal in Volios Group, submitted a letter to

8   Hartford supporting the application. *See* Crawford Letter, Ex. E.  In his letter,

9   Crawford attested to the need for the policy and Mrs. Barnes' ability to pay for it:

> Jean has worked with the Barnes family for 1 year and has played an important role in their insurance and estate planning along with their other advisors…Doris' net worth was projected to be just over $16M with assets totaling $17.5M with annual income of $658,000…[I]t was advised that Doris apply for life insurance coverage to help limit her estate's tax exposure at her death…Premium payments will be made via gifts that Doris will make to the [Trust] using a combination of her bank accounts, non-marketable securities and annual income.

17   Crawford Letter, Ex. E.

18        Based upon the application, the Producer Information form, the Financial

19   Statement, and other documents submitted during underwriting, Hartford approved

20   the Barnes application for $8.75 million in coverage.  On April 28, 2008, Hartford

21   transmitted the policy to Volios Group, which would in turn transmit the policy to

22   Diverse Financial, for delivery to the Barnes trust. *See* Barnes Policy, Ex. F.

23   However, the policy would not become operative until all of the requirements for

24   delivery had been completed and Hartford had received the initial premium

25   payment.[5]  On June 5, 2008, Hartford received a payment in the amount of

26

27   [5] In addition to the initial premium payment, the delivery requirements included, among other

28   things, a Trust Certification Form, Policy Delivery Receipt, a completed W-9 form, and various

1 │ $83,909.36 drawn from a Bank of America account in the names of Mr. and Mrs.

2 │ Barnes and Gary Barnes. *See* Check to Hartford dated May 28, 2008, Ex. Q;

3 │ Confirmation of Premium Receipt, Ex. R. Therefore, on June 5, 2008, after

4 │ receiving all of the delivery requirements and the premium payment, the policy

5 │ became operative. *See* Policy Delivery Information – Producer Instructions, Ex. G,

6 │ at G-91 (stating that policy is cash-on-delivery and that "Hartford must receive

7 │ forms and amount due before the policy is activated").

8 │ **B.      True Circumstances Surrounding Procurement of the Barnes Policy**

9 │ Unbeknownst to Hartford, almost all of the information Hartford relied on

10 │ when issuing the policy was false. In reality, the Barnes policy was the product of

11 │ an elaborate STOLI scheme and flagrant insurance fraud.

12 │ **1.      Mrs. Barnes Is Recruited to Participate in a STOLI Scheme**

13 │ Sometime prior to November 2007, Mrs. Barnes and her husband were

14 │ approached by Jean to participate in a scheme to procure large life insurance

15 │ policies on their lives. Deposition Transcript of Doris Barnes, Ex. H, at 14:21-15:1;

16 │ *see also* Statement of Doris Barnes, dated April 21, 2010 ("D. Barnes Statement"),

17 │ Ex. Y, at Y-431. At the time the Barnes policy was applied for, Mrs. Barnes did not

18 │ need nor want a large face value life insurance policy, nor did Mrs. Barnes have any

19 │ intention of keeping the policy for her own purposes. D. Barnes Dep., Ex. H, at

20 │ 140:16-18 ("when [Jean] first came to us for insurance and we told him that we did

21 │ not want any"). They were told that the policies, if issued, would be resold for a

22 │ profit. *Id.*, Ex. H, at 22:3-6 ("**Q.** So is it fair to say that your understanding was

23 │ whatever insurance policies were being applied for, those policies would be sold?

24 │ **A.** Yes."); *see also* Affidavit of Gary Barnes, Ex. S, ¶ 4 ("My understanding of the

25 │ deal presented by Jean to my parents … was that my parents would apply for life

26 │

27 │ signatures. Policy Delivery Information – Producer Instructions, Ex. G. Hartford required the premium to be paid and the other delivery requirements completed by May 28, 2008. *Id.*

28 │

1  insurance policies that would be sold as soon as they were issued").

2      As an inducement to participate in the scheme, Jean told Mr. and Mrs. Barnes

3  and Gary Barnes that they would not be responsible for *any* costs associated with

4  these policies, including the payment of the premium, and that, once the policies

5  were issued, Mr. and Mrs. Barnes would receive a significant cash payment. *See*

6  D. Barnes Dep., Ex. H, at 22:16-19 ("**Q.** But this sale would be presumably you and

7  your husband would get some amount of cash in exchange for the life insurance

8  policy?  **A.** Yes."); G. Barnes Aff., Ex. S, ¶ 3 ("As far as I know, my mom did not

9  need or want life insurance when Jean presented this deal to her, and she would not

10  have applied for any life insurance (including the Policy) unless Jean had a plan in

11  place to sell the policies and she was getting paid to do so.").

12      Moreover, Mrs. Barnes could not have afforded the premium payments for

13  such a policy, even if she wanted it.  D. Barnes Dep., Ex. H, at 28:2-9 ("**Q.** In early

14  2008 when the Hartford policy was applied for, would you and your husband have

15  been able to afford a life insurance policy that would have cost $400,000 a year to

16  maintain?  **A.** No.  **Q.** Would you have wanted a life insurance policy that cost

17  $400,000 a year to maintain?  **A.** No.).

18      **2.     The Application for the Barnes Policy**

19      In order to complete the STOLI transaction, Jean (with assistance from

20  Diverse Financial) prepared the application. Jean Dep., Ex. A, at 46:8-47:12

21  (stating that Jean filled in some sections of the application himself, while individuals

22  at Diverse Financial filled in other sections).  Jean did not review any of the

23  application materials with Mrs. Barnes, but simply provided signature pages and

24  directed Mrs. Barnes, her husband, and Gary Barnes to sign them.  D. Barnes. Dep.,

25  Ex. H, at 25:25-26:9 ("**Q.** At the top [of the application] appears to be some

26  information about yourself.  Is that your writing?  **A.** No.  **Q.** Do you recognize the

27  writing?  **A.** No.  **Q.** Do you remember whether or not that was filled in when you

28

1  signed the application?  **A.** We did not -- I did not see the whole application, just the

2  signature page.”); G. Barnes Aff., Ex. S, ¶ 6 (“I never saw the completed

3  Application before I signed the Application.  Rather, the signature page for the

4  Application (and that page only) was among several documents that Jean had given

5  to my parents for me to sign.”).  Neither Mrs. Barnes nor Gary Barnes read or

6  reviewed the completed application prior to it being submitted to Hartford.  *Id.*

7        **a.**      **The Lies in the Application**

8       As discussed above, the application asked whether there was an intent to

9  transfer rights or interests in the policy applied for, whether all or any part of the

10  premium payments were being financed by an unrelated third party, and whether the

11  proposed policy owner or insured had been offered any financial incentives to apply

12  for the policy.  *See* Application, Ex. B, at B-17.  The “No” box was checked with

13  respect to each of these questions.  *Id.*  Mrs. Barnes testimony, however, makes it

14  clear that these answers were patently false.  In fact, there was never any intent to

15  keep the policy. *See* D. Barnes Dep., Ex. H, at 22:3-6 (“**Q.** So is it fair to say that

16  your understanding was whatever insurance policies were being applied for, those

17  policies would then be sold?  **A.** Yes.”); G. Barnes Aff., Ex. S, ¶ 5.  The Barnes’

18  testimony reveals Jean’s statements in the Producer Information form to be equally

19  false.  *See* Producer Information, Ex. C (answering “no” to questions regarding an

20  intent to transfer, whether a third-party is funding the policy, and whether the

21  insured had been offered a financial inducement).

22        **b.**      **Other Lies in the Procurement of the Barnes Policy**

23       In addition to the lies in the application, Clark Crawford of Volios Group

24  supplied further false information to give the proposed policy the appearance of

25  legitimacy.  Crawford stated that the premium payments for the Barnes policy

26  would be made “via gifts that [Mrs. Barnes would] make to the [Barnes Trust] using

27  a combination of her bank accounts, non-marketable securities and annual income.”

28

*See* Crawford Letter, Ex. E.  However, Mrs. Barnes never intended to use any of her own money or assets to pay the premium for the Barnes policy:

> **Q.** Do you remember how early in the process it was that you came to believe that you would not have to pay for the life insurance?
> **A.** No.
> **Q.** Would you have procured that much life insurance if you had to pay for it?
> **A.** No.

D. Barnes Dep., Ex. H, at 19:19-25.  Indeed, as set forth below, the money to pay for all of the premiums on the Barnes Policy originated from strangers to Mrs. Barnes.  *See* § II.B.4.b, *infra.*

The application materials also included false information regarding Mrs. Barnes financial status.  In particular, the Financial Statement, which was purportedly prepared by Ronald Mitchell, indicated that Mrs. Barnes' income was $658,000, and that her gross net worth was $16,261,000.  Financial Statement, Ex. D.[6]  In fact, these were lies.  According to Mrs. Barnes, neither she nor her husband was employed or earning income other than a very small pension, and her true net worth was less than $1 million:

> **Q.** Is it fair to say your understanding is if you pulled all of your assets together in 2007 or 2008, would they have been less than a million dollars?
> **A.** Yes.
> **Q.** Was your husband employed in 2007, 2008?
> **A.** No.
> . . .
> **Q.** Was he drawing any pension or retirement funds?
> **A.** A real small one from way back when, someplace we do not even know where he got it, just for $103.

---

[6] In his letter, Mr. Crawford also represented that Mrs. Barnes' annual income was $658,000, her gross net worth was $16,261,000.

1  D. Barnes Dep., Ex. H, at 52:9-23

2      Not only was the information contained in the Financial Statement false, but

3  the document itself was a complete fabrication.  While Mr. Mitchell is a CPA who

4  works in the same town where Mrs. Barnes lives, Mr. Mitchell does not know Mrs.

5  Barnes, has never provided services to her or anyone in her family, and flatly denied

6  preparing the Financial Statement submitted to Hartford:

7         I did not prepare [the Financial Statement], and I have no

8         knowledge of the contents therein. In fact, until I was provided
       copies of these documents in 2010 and 2011, I have never before

9         seen these documents (or any drafts of these documents).  The

10         signature[s] ... [are] not my signature[s].  I do not know Doris
       Barnes, her husband Donald Barnes, or any other member of the

11         Barnes family, and I do not have any knowledge of Doris

12         Barnes' net worth (or that of her family).

13  Affidavit of R. Mitchell, Ex. T, ¶¶ 5-7.

14      **3.**    **The Use of a Sham Trust**

15      Mrs. Barnes also was not involved with the establishment of the Barnes trust,

16  the vehicle through which the STOLI scheme was accomplished.  *See* D. Barnes

17  Dep., Ex. H, at 21:10-20.  Mrs. Barnes did not prepare the trust or ask anyone to

18  prepare a trust on her behalf:

19         **Q.** Do you recall there being any discussions about creating a
       trust in conjunction with applying for the life insurance policies?

20         **A.** No.

21         **Q.** Were you *aware* that any trusts were in fact created in
       conjunction with applying for the life insurance policies?

22         **A.** *No.*

23         **Q.** Do you recall Mr. Jean ever talking about that?
       **A.** No.

24

25  *Id.*, at 20:8-18 (emphasis added).  In fact, when asked if she established a trust to

26  purchase the insurance policy, Mrs. Barnes testified that she did not know that a

27  trust would be created in conjunction with applying for insurance and that "nothing

28  about a trust was mentioned."  *Id.*, at 21:19-20. Mrs. Barnes also testified that she

1  had not seen the trust agreement until a Hartford investigator sent a copy of it to her

2  in 2010 (*id.*, at 45:8-12) and that she had no idea that the Barnes trust was the owner

3  of the Barnes policy (*id.*, at 38:19-39:3).

4      **4.**    **Beneficial Interest Transfer**

5      While Hartford's underwriting department considered the Barnes application,

6  the process of transferring the beneficial interest in the Barnes trust was well under

7  way.  Indeed, the very same individuals who were procuring the insurance were

8  simultaneously orchestrating a secondary market transaction for the still non-

9  existent policy.

10      **a.**    **Volios Group Serves as Double Agent**

11      As noted above, Volios Group was the general agent that submitted the

12  application to Hartford.  Unbeknownst to Hartford, however, Damien Rios, one of

13  Volios Group's principals,[7] serves as a broker for secondary market transactions.

14  Deposition Transcript of Damien Rios ("Rios Dep."), Ex. U, at 195:14-200:12.

15  Sometime before March 25, 2008, Clark Crawford, Rios' partner at Volios Group,

16  requested a life expectancy report on Mrs. Barnes. Crawford Dep., Ex. O, at 61:16-

17  62:10; Life Expectancy Report, Ex. I.

18

19

20

21  Rios also acknowledged that life expectancy reports are used by investors to

22  determine the marketability of a policy.  Rios Dep., Ex. U, at 84:10-17.

23      Although Rios denied that the life expectancy report requested in March 2008

24  was to facilitate a secondary sale of the Barnes policy, he did acknowledge that he

25  began the process of brokering such a transfer as early as May 2008.

26

27

28

On May 1, 2008, before the policy was even delivered to the trust or had become operative, Volios Group had reached an agreement to sell the policy to Pacifica. At that time, Jake Nugent of Pacifica advised Rios that "[w]e can do the Barnes Hart $8.75m policy for 3% over premiums paid. Please let me know if you would like to move forward." *See* May 1, 2008 E-mail from J. Nugent to D. Rios, Ex. V. Thus, almost immediately upon approval of Mrs. Barnes' application, there was an agreement in place to transfer the Barnes policy to a third-party investor.

### b.    Completion of Secondary Market Transfer Action

Around this same time, Diverse Financial was advancing the initial premium payment to Mrs. Barnes. Hartford had transmitted the policy to Volios Group on April 28, 2008, with instructions to return all of the delivery requirements, including the first premium payment, by May 28, 2008. The Barnes application was C.O.D., or cash on delivery, which meant that no premium was paid with the application, and that the policy would not go into effect until it was delivered to the owner, and delivery requirements were completed and an appropriate premium payment was mailed. Policy Delivery Information – Producer Instructions, Ex. G, at G-90. Once the policy was placed in force, the policy owner would have thirty days to review

---

[8] Pacifica, along with Midas Life Settlement, LLC, the entity that ultimately acquired the beneficial interest in the Barnes trust, was a subsidiary of KBC Financial Products USA, Inc. *See* Declaration of J. Pavlovcak, ¶ 27. In fact, Pacifica, Midas, and KBC have each designated the same individual to testify in response to a deposition notice directed to each of those entities pursuant to Rule 30(b)(6). *Id.*

1  the policy to cancel it for a full refund.  Barnes Policy, Ex. F, at F-43.  In this case,

2  the STOLI promoters used the time between delivery of the policy to Volios Group

3  and the expiration of the free-look period to consummate the secondary market

4  transaction that had been planned from the very beginning.

5  **(1)     Advance of Funds by Diverse Financial**

6          As Mrs. Barnes testified, she did not provide any of the funds used to make

7  even the first premium payment.  In fact, on June 4, 2008, Diverse Financial made a

8  deposit in the amount of $83,909.36 to the Bank of America account of Mr. and

9  Mrs. Barnes.[9]  Bank of America June 11, 2008 Statement, Ex. J.  This deposit was

10 then used to make the June 5, 2008, payment to Hartford in the amount of

11 $83,909.36.  Check to Hartford dated May 28, 2008, Ex. Q; D. Barnes Dep., Ex. H,

12 at 67:22-68:1. ("the money to cover this first payment to Hartford did come from

13 "Diverse Financial.").  The check was dated May 28, 2008, which was within the

14 time frame for completing all delivery requirements.

15 **(2)     Transfer of Beneficial Interest in Trust**

16          Rather than simply transfer ownership of the policy, which is a routine

17 transaction that can be completed by executing a one-page form, the STOLI

18 promoters here completed the transfer by way of a beneficial interest sale.[10]  The

19 beneficiary of the Barnes trust was Donald Barnes, Mrs. Barnes' husband.  Barnes

20 Trust, Ex. K.  Based on the May 1, 2008 offer, Mr. Barnes agreed to sell his

21 beneficial interest in the trust to Midas in exchange for $346,409.36.  A "beneficial

22

23

24 [9] This account was opened at the direction of Diverse solely to facilitate this transaction. *See* D. Barnes Dep., Ex. H, at 66:17-67:3.

25 [10] The purpose of a beneficial interest sale was to conceal the STOLI transaction from Hartford.
26 Rios Dep., Ex. U, at 40:4-16 ("**Q.** Would you agree with me that a beneficial interest transfer allows the participants in that transaction to conceal from the insurance company the sale of the
27 interest in the policy?  . . .  **A.** Does it allow them to conceal it -- the carrier won't be aware of it.
**Q.** So that's a yes?  . . .  **A.** Yes.").

28

1  interest purchase agreement" was executed on July 28, 2008 by Mrs. Barnes, Mr.

2  Barnes, Gary Barnes and Midas.  Beneficial Interest Purchase Agreement, Ex. W.

3  On August 8, 2008, $346,409.36, which was approximately 3% of the death benefit

4  was deposited via wire transfer from Midas to the Barnes' account.  Bank of

5  America August 12, 2008 Statement, Ex. L.

6       On August 7, 2008, a check dated May 28, 2008, signed by Donald Barnes

7  and drawn from the Account and made payable to Diverse Financial was paid.

8  Check to Diverse Financial dated May 28, 2008, Ex. M.  This check was the

9  repayment of the money advanced by Diverse Financial in order to fund the initial

10  premium for the Barnes Policy.  D. Barnes Dep., Ex. H, at 72:14-25.

11                                          **III.**

12                                   **ARGUMENT**

13  **A.   Hartford is Entitled to Summary Judgment Because the Barnes Policy Is
14        an Illegal Wagering Contract.**[11]

15       Jurisdictions throughout the United States prohibit the use of insurance for the

16  purpose of wagering on human life.  This long-established prohibition has been

17  codified in California's Insurance Code.  The defendants' procurement of the Barnes

18  policies and immediate transfer to Midas is merely an attempt to do indirectly what

19  cannot be done directly.  For the reasons discussed below, this court should find that

20  _____

21  [11] Summary judgment is proper when there are no disputed issues of material fact and the
     moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex*
22  *Corp. v. Catrett*, 477 U.S. 317 (1986).  If the moving party establishes the absence of any
     genuine issue, the burden shifts to the non-moving party to produce evidence of the
23  existence of a genuine issue for trial. *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio
     Corp.*, 475 U.S. 574 (1986).  The non-moving party may not merely rest on the pleadings,
24  but must affirmatively establish through admissible evidence that a triable material fact
     remains. *Celotex Corp.*, 477 U.S. at 324.  "In order to avoid summary judgment, a non-
25  movant must show a genuine issue of material fact by presenting *affirmative evidence* from
     which a jury could find in his favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009)
26  (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).  "A non-movant's bald
     assertions or a mere scintilla of evidence in his favor are both insufficient to withstand
27  summary judgment." *Id.* (citing *Galen v. Cnty. of Los Angeles*, 477 F.3d 652, 658
     (9th Cir. 2007)).

28

14

1   the Barnes policy lacked an insurable interest at inception and is, therefore, void

2   *ab initio*.

3   **1.    Historical Prohibition on Using Life Insurance to Gamble on Lives of Strangers.**

4       California's statutory prohibition on the use of life insurance to gamble on the

5   lives of strangers derives from a long established English rule.  In 18th century

6   England, when newspapers published names of prominent individuals who were

7   seriously ill, gamblers would often place bets predicting their dates of death.  *See,*

8   *e.g.*, Florida STOLI Bulletin, Ex. N.  Disgusted by this "mischievous Kind of

9   Gaming," the English Parliament passed the Life Assurance Act of 1774.  Life

10  Assurance Act, 1774, 14 Geo. 3, c. 48, § 1 (Eng.).  The act prohibited the

11  procurement of life insurance by individuals who lacked an interest in the life of the

12  insured:

13  > No Insurance shall be made by any Person . . . on the Life
14  > or Lives of any Person or Persons . . . wherein the Person
    > or Persons for whose Use, Benefit, or on whose Account
15  > such Policy or Policies shall be made, shall have no
    > Interest, or by way of Gaming or Wagering; and that
16  > every Assurance made, contrary to the true Intent and
17  > Meaning hereof, shall be null and void, to all Intents and
    > purposes whatsoever.
18

19  *Id.*  Thus was born the modern day requirement of insurable interest.

20      Courts and legislatures in the United States imported the insurable interest

21  requirement into American common and statutory law.  In the seminal decision of

22  *Warnock v. Davis*, 104 U.S. 775 (1882), the United States Supreme Court addressed

23  the validity of a life insurance policy that was akin to a modern day STOLI

24  transaction.  In that case, the insured agreed to take out a policy and to transfer

25  ninety percent of the death benefit to a third party that lacked an insurable interest in

26  his life.  The Court noted that the policy was assignable to the third party trust as

27  security for a loan but that it was not assignable for any other purpose.  "Such a

28  policy would constitute what is termed a wager policy, or a mere speculative

15

1  contract upon the life of the assured, with a direct interest in its early termination."

2  *Warnock*, 104 U.S. at 779.  The Court went on to describe what separates life

3  insurance from "wager policies" is an interest "arising from the relations of the party

4  obtaining the insurance, either as creditor of or surety for the assured, or from the

5  ties of blood or marriage to him." *Id.*

6      In *Grigsby v. Russell,* the Supreme Court addressed the issue of wagering

7  contracts where a policy was legitimately procured but subsequently assigned to a

8  third party who lacked an insurable interest.  In that case, the Court held that

9  assignments are permissible provided they are not a mere cover for an illegal wager.

10  The court distinguished the good faith transfer of a properly procured policy from

11  one that is merely a wager in disguise: "[C]ases in which a person having an interest

12  lends himself to one without any, as a cloak to what is, in its inception, a mere

13  wager, have no similarity to those where an honest contract is sold in good faith."

14  *Grigsby*, 222 U.S. 149, 156 (1911).

15        **2.    California's Prohibition on Wagering Policies and the Requirement of an Insurable Interest.**

16      The principles annunciated in *Warnock v. Davis* and *Grigsby v. Russell* are

17  embodied in California's statutory framework and decisional law.  California's

18  Insurance Code allows insurance to protect against financial loss while

19  simultaneously prohibiting wagering contracts.  The Insurance Code specifies events

20  that are subject to insurance:

21          Except as provided in this article, any contingent or

22          unknown event, whether past or future, which may

        damnify a person having an insurable interest, or create a

23          liability against him, may be insured against, subject to

24          the provisions of this code.

25  Cal. Ins. Code § 250.  In contrast, any insurance policy that is used as wager is void

26  as against public policy.  Cal. Ins. Code § 252 ("A policy executed by way of

27  gaming or wager is void.").

28

1    In order to distinguish between permissible insurance contracts and prohibited

2 wagering contracts, California's Insurance Code requires the existence of an

3 insurable interest. *See, e.g.,* Cal. Ins. Code, § 10110.1(f).[12] Indeed, the "rule that

4 the purchaser of an insurance policy must have an insurable interest in the subject

5 matter at the time of procuring the insurance pervades the entire field of insurance

6 law." *Osbourne v. Sec. Ins. Co.* 155 Cal. App. 2d 201, 205, 318 P.2d 94, 97 (1957).

7 In the absence of an insurable interest, "the policy is a mere wager on the life of the

8 person insured, and the policy is void as against public policy." *Jimenez v.*

9 *Protective Life Ins. Co.,* 8 Cal. App. 4th 528, 536, 10 Cal. Rptr. 2d 326, 300 (1992)

10 (citing *Warnock v. Davis,* 104 U.S. 775 (1882)).

11    In the life insurance context, California's Insurance Code defines an insurable

12 interest as "an interest based upon a reasonable expectation of pecuniary advantage

13 through the continued life, health, or bodily safety of another person and consequent

14 loss by that person's death or disability or a substantial interest engendered by love

15 and affection in the case of individuals closely related by blood or law." Cal. Ins.

16 Code § 10110.1(a). The Insurance Code further provides that "[a]ny contract of life

17 or disability insurance *procured or caused to be procured* upon another individual is

18 void unless the person applying for the insurance has an insurable interest in the

19 individual insured at the time of application." Cal. Ins. Code § 10110.1(g)

20 (emphasis added).

21    **3.    Barnes Policy is an Illegal Wagering Contract**

22    The facts adduced in discovery reveal that the Barnes policy was never

23 intended to protect the Barnes family from financial losses in the event of Mrs.

24

25 _____

26 [12] In 2009, Cal. Ins. Code Section 10110.1 was amended by adding two new provisions as subdivisions (d) and (e) and designating former subdivisions (d) through (g) as (f) through (i),

27 respectively. (Stats. 2009, ch. 343, § 1.) For ease of reference, all citations to Cal. Ins. Code Section 10110.1 will be to the current version of the statute.

28

Barnes' death.  Instead, from its inception, the policy was intended as wager on her life by strangers.  Moreover, despite Hartford's efforts to elicit the true purpose for the insurance and to ensure that it was consistent with California's prohibition on wagering, the defendants and others misled Hartford at every turn.

The application submitted to Hartford indicated that Mrs. Barnes was seeking an $8.75 million insurance policy for estate preservation purposes.  *See* Application, Ex. B.  Life insurance is commonly used by wealthy senior citizens for this purpose because it allows their heirs to pay estate taxes without depleting the estate.  In this case, however, the stated purpose of the policy was false, designed to give the policy the appearance of legitimacy.  In addition, the defendants flagrantly lied in response to direct questions regarding the source of the premium for the policy and whether the insured had an intention to transfer the policy or an interest in the policy to a third party investor.  These lies were repeated by John Jean in the agent report.  They were reiterated by Clark Crawford of Volios Group, general agent that submitted the application to Hartford, who falsely advised Hartford that the coverage was "to help limit [Mrs. Barnes'] estate's tax exposure at death."  Crawford Letter, Ex. E.

While Hartford recognizes estate preservation as a legitimate purpose for life insurance, it will nevertheless evaluate the applicant's financial status to ensure that the amount sought is appropriate and consistent with the stated need.  After lying about the purpose of the policy, the defendants committed additional fraud, grossly misrepresenting Mrs. Barnes' income and net worth and creating a phony financial statement.  The defendants' conduct goes beyond exaggeration or dissembling.  It is insurance fraud of the most egregious kind.

Moreover, at the very same time Volios Group was lying to Hartford about the purpose of the policy and Mrs. Barnes financial status, Volios Group was attempting to broker a secondary market transaction.  As early as March 25, 2008,

1   while Hartford was evaluating Mrs. Barnes application, Volios Group obtained life
2   expectancy report on Mrs. Barnes.  *See, e.g.,* Life Expectancy Report, Ex. I.  The
3   purpose of these life expectancy reports was to permit an investor to evaluate
4   whether the policy is saleable and, if so, at what price.

5       On April 28, 2008, after Hartford approved the application, it transmitted the
6   policy to Volios Group, which, in turn, was to send it to Diverse Financial for
7   ultimate delivery to the intended owner.  On May 1, 2008, before any of the delivery
8   requirements necessary for the policy to become effective were completed,
9   including the payment of the initial premium, Volios Group received a concrete
10  offer to purchase the Barnes Policy for approximately 3% of face value.  *See* May 1,
11  2008 E-mail from J. Nugent to D. Rios, Ex. V.

12      It is likely that the defendants will attempt to argue that the transaction here
13  was legitimate because it post-dated the issue date of the policy.  Indeed, Midas will
14  likely argue that it was a "bona fide purchaser" of the interest in the trust.  Any such
15  argument, however, is unavailing.  The evidence establishes that Volios Group was
16  working hand-in-hand with Diverse Financial and Midas to procure a policy and
17  simultaneously broker a concealed secondary market transaction.  Midas was well
18  aware that Volios Group served as the general agent for a policy in which the owner
19  and insured attested there was no intention to transfer the policy to third party
20  investors.  Indeed, on May 1, 2008, Midas offered to purchase an interest in a policy
21  that had not yet even come into force.  *Id.*  Even if one's status as a bona fide
22  purchaser could validate a transaction that is void *ab initio*, the evidence here
23  establishes that Midas was not a bona fide purchaser but was a willing participant in
24  the transaction, along with Volios Group and Diverse Financial.

25      The evidence reveals that the defendants and other participants continued
26  their efforts to mislead Hartford even after Midas made its offer.  On June 4, 2008,
27  after Diverse Financial knew that Midas would purchase the beneficial interest in
28

the Barnes trust, Diverse Financial deposited $83,909.36 into the Barnes' account. Diverse Financial then sent a check from the Barnes' trust account to Hartford, giving the appearance that the Barnes family was the source of the premium.  Only the STOLI promoters knew otherwise.  And, weeks after the policy went into effect, in accordance with the plan that was conceived long before, Midas "purchased" the beneficial interest in the Barnes trust for $346,409.36.  *See* Beneficial Interest Purchase Agreement, Ex. W; Bank of America August 12, 2008 Statement, Ex. L.

The documentary evidence establishes conclusively that the transactions surrounding the procurement of the Barnes policy were nothing more than a sophisticated effort to do secretly what cannot be done openly; that the policy was procured by and for an entity that lacked an interest in the continuation of Mrs. Barnes' life; that the STOLI promoters engaged in wanton fraud; and that the secondary market transaction was, by design, entirely hidden from Hartford, which would not have knowingly issued a policy that violated California law.  In addition, the documentary evidence is consistent with the testimony of Mrs. Barnes and her son, who stated clearly that Mrs. Barnes did not want or need a life insurance policy, and only went along with the scheme because it would cost her nothing and she would receive a large cash payment.

The undisputed evidence establishes that the Barnes policy does not insure against a contingent or unknown event "which may damnify a person having an insurable interest."  *See* Cal. Ins. Code § 250.  Quite to the contrary, it is – and was always intended to be – a means for gambling on Mrs. Barnes' life.  The policy thus should be declared void *ab initio*.

**B.**   **Use of a Trust To Engage in Illegal Wagering Does Not Make Illegal Contract Legitimate.**

It is anticipated that the Barnes trust will argue that California's technical requirements for an insurable interest are satisfied because the owner of the policy was a trust, and that the original beneficiary of the trust was a person with an

20

1  insurable interest Mrs. Barnes' life.  Any such attempt to elevate form over

2  substance should be rejected under California's Insurance Code as well as the

3  common law.

4      **1.      Insurance Code Prohibits Any Artifice Designed to Give the**

5      **Appearance of Insurable Interest.**

6       California's Insurance Code provides that "[t]rusts and special purpose

7  entities that are used to apply for and initiate the issuance of policies of insurance

8  for investors, where one or more beneficiaries of those trusts or special purpose

9  entities do not have an insurable interest in the life of the insured, violate the

10  insurable interest laws and the prohibition against wagering on life."  Cal. Ins. Code

11  § 10110.1(d).  Furthermore, "[a]ny device, scheme, or artifice designed to give the

12  appearance of an insurable interest where there is no legitimate insurable interest

13  violates the insurable interest laws."  Cal. Ins. Code § 10110.1(e).  Thus,

14  California's Insurance Code unambiguously prohibits schemes where the

15  participants use a trust as a vehicle for investors to gamble on the lives of others.[13]

16       There is little question that the trust was used here as an artifice to give the

17  appearance of an insurable interest.  The transfer of a legitimately procured life

18  insurance policy can be accomplished simply by executing a change of ownership

19  form and submitting it to the insurer.  This is a routine practice that occurs daily.

20  Midas and its cohorts knew full well that the submission of an ownership change so

21

22  _____

23  [13] The Barnes trust may attempt to argue that Sections 10110.1(d) and (e) should not apply here because those provisions were added to the Insurance Code after the issuance of the Barnes policy.

24  Any such argument is unavailing.  The amendments "shall apply to any transaction involving any life insurance policy *in effect*, or entered into, on or after the operative date of this act."  *See* 2009

25  Cal. Stat., Ch.. 343, sec. 8 (emphasis added); *see also Ohio Nat'l Life Assurance Corp. v. Davis*, No. CV-10-4241 ODW, 2010 WL 4916643, at *3 (C.D. Cal. Dec. 1, 2010) (citing to Cal Ins.

26  Code § 10110.1(e) for policy issued prior to – but in effect on – operative date of amendments);

27  *Hartford Life & Annuity Ins. Co. v. Barnes Trust*, No. CV-10-7560 PSG (C.D. Cal. Feb. 22, 2011) (same).

28

1  soon after the issuance of the policy would have prompted an investigation and a

2  review of the information submitted at the time of the application.[14]  The use of a

3  trust, which itself has a beneficiary who is able to sell his beneficial interest, allows

4  the secondary market transaction to take place without alerting even the most

5  vigilant insurer.  The Barnes trust did not serve any legitimate purpose.  It was a

6  mere artifice designed to give the appearance of an insurable interest.

7       **2.     Courts Are Obliged to Look Beyond Formalities and Assess the**

8                   **Substance of a Transaction.**

9       Separate and apart from California's Insurance Code, courts are obliged to

10  assess "the substance of transactions" and to "treat[] their forms as of secondary

11  importance." *Lencioni v. Fid. Trust & Sav. Bank*, 95 Cal.App. 490, 274 P. 75

12  (1929); *see also* Cal. Civ. Code, § 3528 ("[t]he law respects form less than

13  substance").  It is the court's duty to determine the "true" nature of a purported trust.

14  For example, in *McColgan v. Walter Magee, Inc.* 172 Cal. 182, 155 P. 995 (1916),

15  the California Supreme Court determined that the true settlor of a trust was the

16  designated trust beneficiary and not the beneficiary's brothers who appeared to be

17  settlors of the trust.  Likewise, in *Odnil Music Ltd. v. Katharsis LLC*, No. 5-05-

18  0545, 2007 U.S. Dist. LEXIS 82326 (E.D. Cal. Nov. 6, 2007), a California district

19  court found that the trustee of a trust was also the beneficiary and true settlor of that

20  trust.[15]

21

22   

---

[14] Indeed, Midas went so far as to ensure that even the change of trustee that was effectuated in conjunction with the transfer of the policy would be concealed from Hartford.  *See* July 25, 2008 E-mail from C. Feo (KBCFP/Pacifica) to J. Nugent (Pacifica), Ex. X, at X-430.  ("[notice of trustee change] is executed now, but is not sent to the carrier until two year contestability passes").

[15] A court's obligation to look beyond formalities applies broadly.  *See, e.g., Allen v. Commissioner* 925 F.2d 348, 352 (9th Cir. 1991); *E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, No. CVF 03-5412, 2004 U.S.Dist. LEXIS 29383, at *21 fn. 5 (E.D. Cal. May 14, 2004); *Buchwald v. Superior Court*, 254 Cal. App. 2d 347, 355, 62 Cal. Rptr. 364, 370 (1967); *West Pico Furniture Co. v. Pac. Fin. Loans*, 2 Cal. 3d 594, 603, 469 P.2d 665, 671-72 (1970).

1    Mrs. Barnes and her husband did not retain an estate planning attorney to
2 create a trust for her benefit.  To the contrary, it was a form provided by entities
3 working in conjunction with John Jean, Diverse Financial, and Midas.  Nor did Mrs.
4 Barnes fund the trust.  Significantly, Diverse Financial provided the consideration
5 for the Trust, and it did so only after its agent, Volios Group, had negotiated the
6 purchase of the beneficial interest of the Barnes trust by Midas.  *See McColgan*, 172
7 Cal. At 188 (in determining the true settlor of the trust, courts often look to the
8 source of the consideration for the corpus of the trust).  This Court should reject any
9 attempt by the trust to claim legitimacy merely because the STOLI promoters
10 structured a transaction that gave a false appearance of authenticity.  *See* Cal. Prob.
11 Code, § 15203 ("[a] trust may be created for any purpose that is not illegal or
12 against public policy"); *In re Walkerly's Estate*, 108 Cal. 627, 41 P. 772 (1895)
13 (holding that every valid trust must have a legal purpose; if the purpose is illegal,
14 "the trust itself must fail"); *In re Marriage of Dick*, 15 Cal. App. 4th 144, 161, 18
15 Cal. Rptr. 2d 743, 752 (1993)  ("It is well-settled that a trust created for the purpose
16 of defrauding creditors or other persons is illegal and may be disregarded.").[16]

17 **C.    Hartford is Entitled to Retain All Premium Paid In Connection With the Barnes Policy.**
18
19    If the Court concludes that the policy is void *ab initio* because it is an illegal
20 wagering contract, the Court should then consider Hartford's prayer for relief, in
21 which Hartford seeks a declaration that it may retain all premium paid on the policy.
22 Hartford's request is well supported.  California's Insurance Code explicitly
23

24 _____
[16] *See also* 76 Am. Jur. 2d Trusts § 20 ("A trust must have a lawful subject matter.  Generally,
25 where the object of a trust is to circumvent a statutory prohibition or defeat a public policy, the
26 trust is void and of no effect, and one who wishes to dispose of his or her property through the
device of a trust must do so subject to considerations of policy, and a person cannot force the
27 courts to sanction his or her scheme of disposition if it is inimical to the interests of the state.  It
follows that criminality of purpose ordinarily voids a trust."); *see also* Cal Ins Code § 10110.1(e).
28

provides that premium is to be returned where the insurer did not incur liability on the policy, except in cases, such as this one, involving actual fraud.

Section 483 of California's Insurance Code provides that "[a] person insured is entitled to a return of the premium … [w]hen, by any default of the insured *other than actual fraud*, the insurer did not incur any liability under the policy." *See* Cal. Ins. Code § 483 (emphasis added). The "actual fraud" exception recognized in the California Insurance Code is consistent with the common law recognized in jurisdictions throughout the country for over 100 years.

Historically, where a policy has been procured by fraud or deception of the insured or his agent, "the insured has no right to the return of the premium." *See* 5 Couch on Insurance 3d, § 79:40. This rule dates back to 18th Century English courts, and "has been adopted without any material dissent" in jurisdictions throughout the United States. *See Aetna Life Ins. Co. v. Paul*, 10 Ill. App. 431, 441-42 (Ill. App. Ct. 1882).[17] Moreover, this rule has also been applied recently by other courts in the STOLI context. *See, e.g., Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799-800 (6th Cir. 2009) (holding that premiums paid to insurer for fraudulently obtained life insurance policies cannot be recovered); *PHL Variable Ins. Co. v. Lucille E. Morello 2007 Irrevocable Trust*, Civil No. 08-572, 2010 U.S. Dist. LEXIS 29501 (D. Minn. Mar. 3, 2010) ("If all moneys thus voluntarily paid can be recovered or must be returned by the insurer as a condition precedent to pleading the fraud as a defense, a party who contemplates obtaining insurance by false

---

[17] *See, e.g., Himely v. South Carolina Ins. Co.*, 1 Mill Const. 154, 1817 WL 669 (S.C. Const. 1817) (court stated that in cases of actual fraud on the part of the insured, there is no return of premium); *Nat'l Mut. Fire Ins. Co. v. Duncan*, 98 P. 634, 637-638 (Colo. 1908) (same); *Modern Woodmen of Am. v. Int'l Trust Co., Guardian*, 136 P. 806, 814-15 (Colo. App. Ct. 1913) (same); *Columbian Nat'l Life Ins. Co. v. Mulkey*, 91 S.E. 106 (Ga. 1916) (same); *Hellman v. Nat'l Council of the Knights and Ladies of Sec.*, 200 S.W. 698, 700 (Mo. Ct. App. 1918) (same); *Bosse v. Knights & Ladies of Sec.*, 220 S.W. 993, 995 (Mo. Ct. App. 1920) (same); *Ray v. United States*, 121 F.2d 416, 419 (7th Cir. 1941) (same); *Fisher v. Metro. Life Ins. Co.*, 35 N.E. 849, 850 (Mass. 1894) (same).

24

1  representations may well feel that he is taking no chances of loss....")

2  (citations omitted).

3      As set forth at length above, the Barnes policy is tainted by multiple instances

4  of actual fraud.  The Court should find that Hartford's demonstration is sufficient

5  under § 483 to obviate any obligation to return premium.[18]

6                          **IV.**

7                      **CONCLUSION**

8      Hartford respectfully requests that this Court enter summary judgment

9  declaring that the Rucker policy is void due to a lack of insurable interest at

10  inception and due to material misrepresentations in the application.

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20

21

22  [18] The Court should permit Hartford to retain all premium paid in connection with the policy.
    However, Hartford acknowledges that some courts in similar circumstances have attempted to
23  fashion an equitable remedy that balances the interests of the parties.  *See, e.g.*, *PHL Variable Ins.
    Co. v. Clifton Wright Family Ins. Trust*, No. 09-2344, 2010 U.S. Dist. LEXIS 35643, at *11 (S.D.
24  Cal. Apr. 12, 2010) (noting court's "authority under this section to compensate aggrieved parties
    for damages sustained ... in connection with a rescinded contract").  The Court should allow
25  Hartford to retain all premium even under an approach that seeks to balance the equities.  The
    evidence establishes that the defendants utilized a sophisticated scheme to evade California's
26  prohibition on wagering contracts, and that the defendants lied at every turn to prevent Hartford
    from learning the truth.  There is no equitable reason to return money to persons who would
27  commit such egregious fraud.

28

                          25

1   DATED:  November 29, 2011            DRINKER BIDDLE & REATH LLP

2

3                                       By:    /s/ Jason P. Gosselin

4                                            Jason P. Gosselin

5                                            William A. Hanssen

6                                            Suzanne V. Stouder

7                                            DRINKER BIDDLE & REATH LLP

8                                            333 South Grand Avenue, Suite 1700
                                             Los Angeles, CA 90071-1504
9
                                             *Of Counsel*
10                                           Michael J. Miller (*pro hac vice*)
                                             Jason P. Gosselin (*pro hac vice*)
11                                           Jonathan D. Pavlovcak (*pro hac vice*)
                                             DRINKER BIDDLE & REATH LLP
12                                           One Logan Square, Suite 2000
                                             Philadelphia, PA 19103
13

14
                                             Attorneys for Plaintiff
15                                           HARTFORD LIFE AND ANNUITY
                                             INSURANCE COMPANY
16

17

18

19

20

21

22

23

24

25

26

27

28